# AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT

I, Joel N. Hegarty, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn according to the law, hereby state that the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. Your Affiant, Joel N. Hegarty, is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, with the meaning of Title 18, United States code, Section 3051, and is an officer of the United States empowered by law with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States.

2. Your Affiant's primary duties consist of the enforcement of federal firearms laws, armed narcotics trafficking laws and conspiracy laws.  Prior to graduating from the Federal Law Enforcement Training Center in 2020 and becoming an ATF Special Agent, Your Affiant was employed with Ernst and Young for over four (4) years, working as a Senior Forensic Accountant in Ernst and Young's Forensic Accounting practice. While employed as an ATF Special Agent, Your Affiant has conducted and participated in numerous federal investigations. Your Affiant has participated in the execution of numerous federal and state search warrants involving violent crime, organized crime, illegal firearms possession, firearms trafficking, the use and trafficking of narcotics, and armed narcotics trafficking. Your Affiant is familiar with federal criminal laws pertaining to firearms and drug violations.

3. Your Affiant works with other law enforcement officers with decades of experience enforcing federal firearms laws, and Your Affiant benefits from their knowledge. Your Affiant investigates violations of federal firearms laws and armed narcotics traffickers in the normal course of his duties and is familiar with the facts of this case.

4. The statements contained in this affidavit are based, in part, on information provided by Special Agents and Task Force Officers of the ATF and other law enforcement officers; on conversations held with police officers; and on Your Affiant's background and experience as a Special Agent of the ATF. Your Affiant has not included each and every fact known to Your Affiant concerning this investigation.  Your Affiant has set forth only the facts that Your Affiant believes are necessary to establish the required foundation for an order authorizing the arrest of Jose Manuel Guerra-Caballero.

## AFFIDAVIT PURPOSE

5. This affidavit is submitted to support a criminal complaint and application for arrest warrant for and against Guerra-Caballero.

6. Your Affiant submits that from on or about January 14, 2025, through January 29, 2025, in the State and District of Colorado, the defendant, Guerra-Caballero, conspired to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 846, and aided and abetted in the possession of a

firearm, that is a weapon which will, or is designed to, or may readily be converted to expel a projectile by the action of an explosive, in furtherance of that drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), as summarized in the conclusion section below.

7. Because this affidavit is submitted only to obtain a criminal complaint and arrest warrant, I have set forth only those facts I believe are necessary to establish probable cause for the above-mentioned offenses in paragraph five.

8. The facts in this affidavit come from my personal observations, interviews, police reports, body camera footage, jail calls, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrant and does not set forth all of my knowledge about this matter.

## INVESTIGATION

9. The United States, including the ATF, is conducting a criminal investigation of Guerra-Caballero both identified and unidentified co-conspirators regarding possible violations of 21 U.S.C. § 846, and 18 U.S.C. § 924(c)(1)(A)(i) (hereinafter "the Subject Offenses").

10. In October of 2024, the ATF began an investigation into armed narcotics and firearms trafficking activities occurring in the Denver, CO area, stemming from information obtained from the Adams County Sheriff's Office. A Confidential Informant ("CI") was directed by Your Affiant to frequent the Ivy Crossing apartment complex, located at 2470 S Quebec St, Denver, CO 80231, and obtain information relating to individual(s) engaged in criminal activity. The CI has been given monetary compensation in exchange for giving law enforcement reliable information on criminal activities on dozens of prior occasions, and no information provided by the CI has subsequently proven false. He/she is not trying to reduce any sentence in exchange for his/her cooperation. The CI has past felony convictions, but none within the last 9 years, and none involving falsehoods or deception.

11. According to the CI, he/she met an individual identified as having the initials L. A. P. on or about October 9, 2024, in the area around the Ivy Crossing apartment complex. During the initial interaction, L. A. P. discussed with the CI that L. A. P. was from Venezuela and has numerous associates in the Denver and Aurora areas who are also from Venezuela. Over the course of the next several weeks, the CI and L. A. P. engaged in recorded communications in which L. A. P. purported to be involved in firearms trafficking activities with his criminal associates.

### *Undercover Purchase #1 – November 14, 2024*

12. Between October 9, 2024 and November 14, 2024, at the direction of Your Affiant, the CI engaged in conversation with L. A. P. regarding purchasing multiple firearms from L. A. P. and his criminal associates.

13. On November 14, 2024, prior to the undercover meeting, the CI informed ATF SA 6373 ("UC1") that L. A. P. had a friend (who was subsequently identified as Guerra-Caballero) who had multiple firearms for sale. While in the presence of L. A. P. and Guerra-Caballero, the CI placed a FaceTime called UC1 to show UC1 the firearms that L. A. P. and Guerra-Caballero

were attempting to sell. During the FaceTime call, UC1 observed Guerra-Caballero to be wearing the same pink shirt that Guerra-Caballero would later wear to an ATF undercover controlled location (UC Location), which is located in the City and County of Denver, CO. Additionally, during the FaceTime call, UC1 observed Guerra-Caballero remove two (2) firearms from a backpack and show UC1. Both firearms shown to UC1 by Guerra-Caballero on the FaceTime call appeared to be the same firearms and that UC1 would purchase from Guerra-Caballero later that day as described below.

14. Later on November 14, 2024, the CI, at the request of L.A.P. and Guerra-Caballero, picked up L. A. P. and Guerra-Caballero at the Ivy Crossing apartment complex, located at 2470 S Quebec St, Denver, CO 80231. The CI advised UC1 that the CI and L. A. P. then drove to another area in the Ivy Crossing apartment complex area where Guerra-Caballero was observed exiting the south stairwell area of the building with assigned address 7535 E Harvard Ave, Denver, CO 80231, carrying a backpack, and entered the CI's vehicle. The CI then drove L. A. P. and Guerra-Caballero to the UC Location, where the below undercover meeting took place between UC1, ATF SA 3997 ("UC2"), the CI, L. A. P., and Guerra-Caballero.

15. The CI arrived at the UC Location with L. A. P. and Guerra-Caballero. UC1 exchanged greetings with L. A. P. and Guerra-Caballero, and Guerra-Caballero introduced himself to UC1 as "Jose." Guerra-Caballero and L. A. P. walked to the back area of the garage. Guerra-Caballero placed the backpack he was carrying onto the top of the bar and pulled out two firearms and a 30-round magazine. The Keltec firearm was folded in half when Guerra-Caballero pulled it out of the backpack. Guerra-Caballero then unfolded the Keltec firearm for UC1 to see and picked up the 30-round magazine which UC1 observed to have ammunition inside the magazine. Guerra-Caballero placed the magazine inside the Keltec firearm to show UC1 how it worked. Guerra-Caballero then gave the Keltec firearm with the loaded magazine to UC1. Guerra-Caballero demonstrated to UC1 how the Keltec firearm worked. He showed UC1 how to pull the bolt back to the rear of the firearm and load the firearm with live ammunition. Guerra-Caballero explained after the Keltec firearm is loaded with the 30-round magazine, one pull of a trigger will fire all 30 rounds at the same time. As UC1 was testing the bolt of the firearm, Guerra-Caballero said the Keltec firearm was "*automatica*." Guerra-Caballero pointed to the number "30" on the back of the magazine, and then advised that when the trigger is pulled it just dumps all the rounds at once. UC1 explained to Guerra-Caballero and L. A. P. that purchasing the Keltec firearm for $1,200 was a little expensive if the firearm was not a fully automatic machinegun. L. A. P. demonstrated with L. A. P.'s hands and told UC1 the Keltec firearm sounds like "Brrrrrrrrrrrt," which UC1 understood as street terminology for the firearm being a fully automatic machinegun.

16. Guerra-Caballero picked up the second firearm, a Ruger revolver, and showed UC1 the firearm did not have any live ammunition inside of the cylinder. Guerra-Caballero then pointed the revolver and pulled the trigger multiple times. As Guerra-Caballero was pulling the trigger to show UC1 how the Ruger revolver worked, Guerra-Caballero advised the Ruger revolver does not dispose of spent shell casings. UC1 understood this as a reference to having to pick up shell casing if the firearm is used in a shooting so law enforcement wouldn't find the spent shell casings. Guerra-Caballero advised UC1 that as long as UC1 conducts good business and purchases the firearms at a fair price, Guerra-Caballero will have additional firearms for UC1 to purchase and everyone involved in the firearm transaction can all make good money trafficking firearms. UC1 told Guerra-Caballero and L. A. P. where UC1 takes the firearms to sell that UC1 makes more money if the firearms are fully automatic machineguns. Guerra-Caballero then

pulled out a cell phone with a white case and opened up a messaging application. Guerra-Caballero clicked on a contact and showed UC1 a picture of multiple pistols. Guerra-Caballero advised the pistols are fully automatic pistols. UC1 asked about the prices of the firearms. Guerra-Caballero confirmed that the prices of the firearms were $1,200 to purchase the Keltec firearm and $800 to purchase the Ruger revolver. Guerra-Caballero then pulled out six (6) rounds of ammunition from the backpack and placed them on the bar. Guerra-Caballero advised the ammunition was for the revolver, and it was hollow point ammunition. Guerra-Caballero explained the hollow point ammunition was designed to explode when it hits a person to do the maximum amount of physical damage.

17. UC1 counted out $1,200 of pre-recorded buy money/U.S. currency and gave it to Guerra-Caballero for the purchase of the Keltec, model Sub-2000, 9mm caliber rifle, bearing S/N: FF3091. UC1 then counted out $800 of pre-recorded buy money/U.S. currency and gave it to Guerra-Caballero for the purchase of the Ruger, model Speed Six, .357 caliber revolver, bearing S/N: 15661160. Guerra-Caballero and L. A. P. asked if UC1 has more money to purchase additional firearms. UC1 also counted out $150 of pre-recorded buy money/U.S. currency and gave it to L. A. P. for a brokerage fee for setting up the firearms transaction. Guerra-Caballero advised Guerra-Caballero didn't want to acquire more firearms if UC1 wouldn't promise to buy them from Guerra-Caballero. UC1 asked if Guerra-Caballero was talking about the pistols in the picture that Guerra-Caballero showed to UC1. Guerra-Caballero advised Guerra-Caballero was talking about the fully automatic machineguns from the picture that Guerra-Caballero showed UC1. The CI and UC1 then told Guerra-Caballero and L. A. P. that UC1 takes the firearms to New Mexico, and the firearms then get trafficked further south into Mexico. UC1 explained again that UC1 makes more money trafficking the firearms to Mexico if they are fully automatic machineguns.

18. The CI advised Guerra-Caballero and L. A. P. that sometimes the UCs, who own the UC Location, are looking for help doing odd jobs. Guerra-Caballero advised the CI if the UCs need help with committing extortions or assaults that Guerra-Caballero can assist the UCs if the UCs pay a good price. UC2 said that sometimes the UCs have to go collect a debt from people who owe money, and the UCs might be interested in hiring Guerra-Caballero. Guerra-Caballero advised to contact Guerra-Caballero and let Guerra-Caballero know and Guerra-Caballero is willing to commit acts of violence on behalf of the UCs. UC2 asked if Guerra-Caballero has a car and is able to drive, and Guerra-Caballero advised Guerra-Caballero is able to drive. UC2 asked if Guerra-Caballero has any narcotics available for sale. Guerra-Caballero advised Guerra-Caballero has some narcotics for sale and asked what quantities the UCs are wanting to purchase. Guerra-Caballero advised that Guerra-Caballero could sell two (2) ounces of cocaine for $1,400. Guerra-Caballero advised Guerra-Caballero would have to drive somewhere to pick it up. Guerra-Caballero and L. A. P. then advised they need the money for the source of supply to give them the cocaine, so they would not be able to bring the cocaine to the UC Location without the UCs first paying for the cocaine.

19. Guerra-Caballero advised if UC1 wants to purchase the fully automatic machineguns that Guerra-Caballero showed in a picture to UC1, that UC1 would have to drive to Guerra-Caballero's friend to purchase the firearms. L. A. P. advised they came to the UC Location today because they know the CI, but the other people with the firearms don't know the UCs or CI so the UCs will have to drive to meet the new people who have firearms for sale. Guerra-Caballero advised there are a lot of Venezuelans in the Denver area, and Venezuelans don't typically trust

other people. L. A. P. advised most Venezuelans wouldn't trust the UCs because the UCs are talking about firearms and money. Guerra-Caballero advised his friend with additional firearms for sale is in the Westminster, CO area, and the UCs would have to meet Guerra-Caballero at Guerra-Caballero's friend's residence to purchase the firearms.

20. As Guerra-Caballero and L. A. P. were preparing to leave the UC Location, Guerra-Caballero advised Guerra-Caballero has access to purchasing girls from Mexico and bringing them to Denver. Guerra-Caballero advised the UCs would just have to pay Guerra-Caballero $3,000, and once Guerra-Caballero gave the purchased girl to the UCs, the girl would owe a debt of $20,000 to the UCs. UC2 asked if Guerra-Caballero has access to girls locally in the case the UCs wanted to pay for girls to be at a party. Guerra-Caballero affirmed, and advised Guerra-Caballero could provide girls to the UCs to have at a party for a fee. Guerra-Caballero advised Guerra-Caballero would bring the girls to a location and tell the girls they are working at a party for the night. Guerra-Caballero advised some of the girls that Guerra-Caballero would provide for parties are currently located in the Dallas, TX area, but if the UCs wanted to purchase girls, they most likely would be coming from Mexico. Guerra-Caballero advised he needs to confirm the details on his end prior to the UCs placing an order to purchase girls.

21. UC2 asked to confirm what the girls look like that are available for purchase. Guerra-Caballero then pulled out the aforementioned cell phone with a white case, as well as another cell phone with a dark blue/black case. UC1 observed the cell phone with a white case was an Android device, and the cell phone with a dark blue/black case was an iPhone device. Guerra-Caballero opened the "Gallery" application on the Android device and showed the UCs multiple videos and pictures of girls who appeared to be young in age. One of the pictures was a girl wearing a short skirt and holding an AR style firearm. Guerra-Caballero confirmed with the UCs that they could pick out what specific girl they wanted to purchase.

22. The CI, Guerra-Caballero, and L. A. P. then got back into the CI's vehicle and left the area of the UC Location. Immediately following the conclusion of the undercover meeting, the CI drove L. A. P. and Guerra-Caballero back to the Ivy Crossing apartment complex. After L. A. P. and Guerra-Caballero exited the CI's vehicle, the CI drove away from the Ivy Crossing apartment complex and the undercover meeting concluded.

23. The UCs purchased several items, to include a Keltec, model Sub-2000, 9mm caliber rifle, bearing S/N: FF3091, and a Ruger, model Speed Six, .357 caliber revolver, bearing S/N: 15661160, including each firearm being sold with ammunition (FIG. 1-4).



FIG. 1



FIG. 2



FIG. 3



FIG. 4

*Undercover Purchase #2 – November 15, 2024*

24. Between November 14, 2024 and November 15, 2024, at the direction of Your Affiant, the CI continued to engage in recorded text messages and recorded phone calls with L. A. P. regarding an additional purchase several firearms. On November 15, 2024, the CI, at the request of L. A. P. and Guerra-Caballero, picked up L. A. P. and Guerra-Caballero at the Ivy Crossing apartment complex, located at 2470 S Quebec St, Denver, CO 80231, and drove to the UC Location.

25. On November 15, 2024, when the CI arrived at the UC Location, the CI parked in the rear alley area outside of the undercover location and L. A. P. and Guerra-Caballero entered the undercover location with Guerra-Caballero wearing a backpack. Guerra-Caballero sat down on a couch in the rear garage area of the undercover location and took off the backpack and set it on the floor and proceeded to take out two pistols from the backpack. Guerra-Caballero then unloaded both pistols and showed them to the UCs to inspect. Guerra-Caballero explained that both pistols were "semi-automatic pistols", and further explained that did not mean that the pistols were fully automatic, as in being machine guns, only that they were referred to as "*automaticas*" in Venezuela. The UCs asked Guerra-Caballero how much money Guerra-Caballero wanted for both pistols, a Glock and a Sig Sauer, and Guerra-Caballero responded that he wanted $2,700 for both pistols. UC2 asked Guerra-Caballero if he would be willing to sell the pistols for $2,500 instead, and Guerra-Caballero replied that he would be willing to sell both pistols for $2,600. UC2 then briefly walked to another room of the undercover location to obtain

the pre-recorded Agent Cashier Funds (ACF), (buy money/U.S. currency) for the undercover purchase of the two firearms. UC2 returned with the money shortly thereafter and proceeded to count the money at a bar/counter area of the undercover location.

26. As UC2 was counting the money, UC1 and the CI had additional conversations with Guerra-Caballero and L. A. P. about the possibility of obtaining Glock machine gun conversion devices, commonly referred to as Glock switches for the Glock pistol. Guerra-Caballero replied that he was familiar with the machine gun conversion devices and further stated that he would be able to obtain the devices through his contacts with other Venezuelan nationals. UC2 then directed UC1, the CI, Guerra-Caballero, and L. A. P. over to the bar/counter area where UC2 had the money ready for the purchase of the two pistols. The CI handed the Sig Sauer pistol to UC2, and UC1 carried the Glock pistol over to the bar/counter area so that UC2 could further inspect both pistols. UC2 observed that the two pistols were a Glock Model 22 .40 caliber pistol with an obliterated serial number and a tactical flashlight attached to the frame of the firearm, which was loaded with six (6) rounds of .40 caliber ammunition, and a Sig Sauer Model P320 M17 9mm caliber pistol bearing serial number 59H351986, which was loaded with seven (7) rounds of 9mm caliber ammunition.

27. UC2 then counted out $2,600 of pre-recorded Agent Cashier Funds (buy money/U.S. currency) for the undercover purchase of the two pistols and showed the money to Guerra-Caballero so he could confirm that the amount of money for the purchase was correct, and then subsequently placed the buy money on the bar countertop for Guerra-Caballero for the purchase of the Glock pistol and the Sig Sauer pistol. UC2 then also paid an additional 150.00 of buy money to L. A. P. for his role in arranging and brokering the purchase of the pistols from Guerra-Caballero as part of the undercover transaction. Guerra-Caballero then continued talking to the UCs about sex trafficking of Venezuelan females and selling the females to the UCs for the purpose of sex work, which was a continuation of the conversation between L. A. P., Guerra-Caballero, and the UCs from the prior undercover contact. Guerra-Caballero explained that he could provide females to the UCs for parties, and further stated that the UCs could do whatever they wanted with females after they purchased them. Guerra-Caballero further stated that the UCs would be responsible for providing food and housing to the females and the females would be responsible for working off an additional monetary payment to Guerra-Caballero as part of the agreement. Guerra-Caballero further explained that the Venezuelans currently had females working for them in the sex trade in China, Peru, and in every state in the United States who were making money for them.

28. The UCs asked Guerra-Caballero how old the females that he had available were, and Guerra-Caballero replied that none of the females were older than twenty-four years old. UC2 told Guerra-Caballero that he would want to take the females to Wyoming to work for him and provide sexual services to the oil field workers. Guerra-Caballero replied that he would be able to provide women to UC2 for that purpose. Guerra-Caballero then took out his cell phone and made a live FaceTime video call to an unknown Hispanic female and during the video call Guerra-Caballero showed the live video to the UCs and CI and told them that he could bring the specific female on the video call to Wyoming to work for the UCs.

29. The CI, L. A. P., and Guerra-Caballero left the undercover location, and the CI subsequently transported both L. A. P. and Guerra-Caballero back to the Ivy Crossing apartment complex, located at 2470 S Quebec St, Denver, CO 80231. After L. A. P. and Guerra-Caballero exited the

CI's vehicle, the CI drove away from the Ivy Crossing apartment complex and the undercover meeting concluded.

30. The UCs purchased several items, to include a Glock Model 22 .40 caliber pistol with an obliterated serial number and a tactical flashlight attached to the frame of the firearm, which was loaded with six (6) rounds of .40 caliber ammunition, and a Sig Sauer Model P320 M17 9mm caliber pistol bearing serial number 59H351986, which was loaded with seven (7) rounds of 9mm caliber ammunition (FIG. 5-6).

 

FIG. 5                              FIG. 6

## *Undercover Purchase #3 – December 3, 2024*

31. Between November 15, 2024, and December 3, 2024, at the direction of Your Affiant, the CI continued to engage in recorded text messages and recorded phone calls with both L.A.P. and Guerra-Caballero regarding an additional purchase of firearms and narcotics.

32. On December 3, 2024, L.A.P. and Guerra-Caballero arrived at the UC Location driving a green Ford Escort SE, bearing Colorado license plate CRP-H02. L.A.P. exited the vehicle from the front passenger seat, and Guerra-Caballero exited the vehicle from the driver's seat. Guerra-Caballero was carrying a black and silver colored AR style firearm. Guerra-Caballero placed the firearm on the bar and extended tri-pod legs that were attached to the barrel of the AR style firearm to show UC1 how it worked. GUERRA then showed the CI and UC1 a magazine loaded with ammunition and placed the magazine into the magazine well of AR style firearm. L.A.P. advised L.A.P.'s associates had additional firearms for sale but did not want to meet at the UC Location because L.A.P.'s associates did not know UC1. L.A.P. advised that L.A.P. was calling his associates to see if they would bring the firearms to the UC Location. L.A.P. then showed the CI and UC1 a video on L.A.P.'s cell phone. In the video, UC1 observed an unknown Hispanic individual was displaying an AR style firearm that was different than the firearm brought to the UC Location by Guerra-Caballero and L.A.P.

33. L.A.P. advised L.A.P. was actively attempting to set up an additional firearm transaction for L.A.P.'s associates to bring another AR style firearm to the UC Location. UC1 asked if L.A.P. and Guerra-Caballero brought a Glock pistol to sell, as Guerra-Caballero and L.A.P. had previously discussed with the CI in recorded communications selling a Glock pistol. Guerra-Caballero reached inside his waist band and removed a Glock, model 19, 9mm caliber pistol. Guerra-Caballero placed the Glock 19 onto the bar and Guerra-Caballero advised UC1 could

look at the Glock 19 to determine if UC1 wanted to purchase the firearm. UC1 discussed with L.A.P. about purchasing additional firearms at a lower price. L.A.P. picked up the Glock, model 19, 9mm caliber pistol, examined it, and placed it back on the bar for UC1 to consider purchasing. UC1 asked about the prices of the firearms. UC1 advised the CI to inform Guerra-Caballero and L.A.P. that UC1 would pay $700 for the Glock 19 pistol. Guerra-Caballero advised that a store might sell a Glock 19 pistol for around $700, but street prices are higher than store prices because sellers of firearms need to make seller fees. Guerra-Caballero advised he will sell the AR style firearm for $1,500, and he will sell the Glock 19 pistol for $1,000. UC1 advised the CI to explain to Guerra-Caballero and L.A.P. that UC1 takes all the firearms he purchases from Guerra-Caballero and L.A.P. to Mexico and sells the firearms in Mexico. However, UC1 has to purchase the firearms at a low price in the Denver area so UC1 can make money selling the firearms to people in Mexico.

34. L.A.P. and Guerra-Caballero discussed selling UC1 a type of narcotic with the street name "tusi," which is a narcotic commonly known to contain a variety of controlled substances including methamphetamine, cocaine, MDMA, and ketamine. L.A.P. and Guerra-Caballero advised they forgot to bring a sample of the "tusi," but they could bring it later in the day for UC1 to test out.

35. UC1 counted out $1,500 of pre-recorded buy money/U.S. currency and gave it to Guerra-Caballero for the purchase of the no make, no model, no serial number, .223 caliber, semi-automatic firearm, as well as a magazine containing 30-rounds of .223 caliber ammunition. As L.A.P. was speaking with the CI, the CI advised that L.A.P. asked the CI if UC1 was going to give L.A.P. a brokerage fee for setting up the firearms transaction for the black and silver AR style firearm. The CI advised that L.A.P. inferred that $150 was a fair brokerage fee as that is what UC1 paid L.A.P. for brokering the previous firearms transactions. UC1 counted out $150 of pre-recorded buy money/U.S. currency and gave it to L.A.P. as a brokerage fee for facilitating the firearms transaction. Guerra-Caballero and L.A.P. got back into the green Ford Escort and left the area of the UC Location.

36. UC1 purchased a firearm, specifically, a no make, no model, no serial number, .223 caliber, semi-automatic personally made firearm, as well as a magazine containing 30-rounds of .223 caliber ammunition (FIG. 7-8).




FIG. 7   FIG. 8

### *Undercover Purchase #4 – December 12, 2024*

37. Between December 3, 2024, and December 12, 2024, at the direction of Your Affiant, the CI continued to engage in recorded text messages and recorded phone calls with both L.A.P. and Guerra-Caballero regarding an additional purchase of firearms and narcotics.

38. On December 12, 2024, Guerra-Caballero arrived at the UC Location driving a green Ford Escort sedan bearing Colorado license plate number CRPHO2. Guerra-Caballero pulled the vehicle into the garage area of the UC Location and subsequently exited the vehicle. An unidentified female (UF) was seated in the front passenger seat of the vehicle and also exited the vehicle with Guerra-Caballero. UC2 and the CI walked over to greet Guerra-Caballero and Guerra-Caballero walked back to the rear trunk area of the vehicle and opened the trunk and removed an AR-15 type rifle that was partially disassembled in the trunk. Guerra-Caballero then walked over to the bar area of the UC Location and placed the rifle on the counter and assembled the rifle. Once the rifle was fully assembled, Guerra-Caballero handed the rifle to UC2 to examine. UC2 examined the rifle and observed that the rifle was loaded with a magazine containing several rounds of .223 caliber ammunition. UC2 subsequently unloaded the rifle and placed it back on the bar counter.

39. ATF SA 5696 ("UC3) greeted UF, who briefly remained by the vehicle and who could be seen arranging an unknown item in her bra area. UF then walked over to the bar area and met with Guerra-Caballero and subsequently began to interact with UC2 and the CI. UC3 then also followed UF over to the bar area. Guerra-Caballero then directed UF to show the pistol to UC2, and UF then removed a loaded Glock 9mm pistol from her bra/shirt area and handed the pistol to UC2. UC2 examined the pistol and observed that the pistol was loaded with several rounds of 9mm caliber ammunition and UC2 subsequently unloaded the pistol and placed it back on the bar counter. UC2 asked Guerra-Caballero how much money he wanted for the 2 firearms, and Guerra-Caballero replied that he wanted $2,350 for both firearms. UC2 then asked Guerra-Caballero about the Tusi, a controlled substance that Guerra-Caballero had talked about during prior undercover contacts with the UCs. Tusi is a recreational drug that is known on the street to contain a mixture of methamphetamine, cocaine, MDMA, and ketamine. Guerra-Caballero again spoke to UF and indicated for her to give the narcotics to UC2. UF then reached into her left coat pocket and took out a small pink plastic baggie containing the narcotics and handed the baggie to UC2.

40. UC2 examined the narcotics in the plastic baggie and UC2 and the CI then began asking GUE Guerra-Caballero RRA and UF questions regarding the narcotics. Guerra-Caballero and UF explained that the Venezuelans call the narcotic "Tusi" and further explained that it is a party type drug similar to ecstasy that contains a mixture of methamphetamine, powder cocaine, and ketamine. UF explained that they mix a combination of the different narcotics together and then add food coloring to the mixture to create different colors of the drug. Guerra-Caballero further stated that they usually sell 1 gram of the drug for $100, and 1 ounce of the drug for $1,000. UC2 then began negotiating the total price of the rifle, the pistol, and the narcotics with Guerra-Caballero, and Guerra-Caballero ultimately agreed to accept $2,300 for the purchase of all of the items, to include both firearms and the narcotics. UC2 then obtained $2.300 of pre-recorded buy money/U.S. currency for the undercover purchase of the firearms and narcotics. UC2 counted out the money and subsequently handed it to Guerra-Caballero for the purchase of the New Frontier Armory Model LW-15 multi-cal (.223/5.56mm) rifle bearing serial number NLV08448, the

Glock Model 19 9mm pistol bearing serial number BWAH899, and approximately 1 gram of Tusi, for a total of $2,300.

41. The UC's, CI, Guerra-Caballero, and UF then had additional conversation regarding the narcotics, how the narcotics are mixed, and the possibility of the UC's purchasing larger amounts of narcotics at a future date. Guerra-Caballero and UF left the undercover location in the previously identified vehicle. Below are the items purchased on December 12, 2024 (FIG. 9-11).



FIG. 9



FIG. 10



FIG. 11

## Undercover Purchase #5 – January 24, 2025

42. Between December 12, 2024, and January 24, 2025, at the direction of Your Affiant, the CI continued to engage in recorded text messages and recorded phone calls with both L.A.P. and Guerra-Caballero regarding an additional purchase of firearms and narcotics.

43. On January 23, 2025, the CI and Guerra-Caballero (using the Subject Account) arranged to meet the following day, however, Guerra-Caballero advised he was currently in Chicago but would send a friend to deliver an AR-15 to the CI and a UC. The following day, on January 24, 2025, Guerra-Caballero, utilizing the Subject Account, sent the CI a contact name "Geraldo" with phone number "720-850-1970" and told the CI that is the contact for the individual conducting the firearm transaction with the CI.

44. On January 24, 2025, "Geraldo", who was subsequently identified as having the initials J. V. V. and who had been communicating with the CI at cell phone number 720-850-1970, arrived at the UC Location driving a white Toyota Camry bearing Colorado license plate ZE0945. J. V. V. pulled the vehicle into the garage area of the UC Location and subsequently exited the vehicle and greeted the CI and UC2. J. V. V. then opened the rear driver side door and retrieved a black

rifle from the back seat and handed it to the CI. J. V. V. stated he was unable to obtain the methamphetamine. J. V. V., UC2 and the CI walked over to the bar area of the undercover location and the CI placed the rifle on the counter. J. V. V. then greeted ATF SA 6487 ("UC4") and introduced himself as "Gerardo." It should be noted that UC4 observed approximately four (4) tear drop tattoos on the right side of J. V. V.'s face.

45. The CI asked J. V. V. for the price of the rifle in which J. V. V. was under the impression that the CI had already negotiated the price with "him." UC4 understood J. V. V. to be referencing Guerra-Caballero. J. V. V. then walked over to his vehicle to retrieve his cellphone and proceeded to make a phone call. Meanwhile, UC2 examined the rifle and observed that the rifle was loaded with a magazine containing numerous 7.62 mm caliber rounds of ammunition and UC2 subsequently unloaded the rifle and placed it back on the bar counter. While still by his vehicle, J. V. V. asked in Spanish for the price of the firearm then proceeded to walk towards the CI and handed the cellphone to the CI. The telephone call with Guerra-Caballero was placed on speakerphone. During the conversation, Guerra-Caballero stated he was currently in Chicago and said, "yo estoy cuadrando aqui unas armas que me iban a avisar (unintelligible)." Meaning, I'm squaring away here some firearms that they were going to let me know (unintelligible). The CI then inquired about the price for the rifle in which Guerra-Caballero replied, "$1,500." The CI told Guerra-Caballero that UC2 wanted to discuss a proposition with him. Guerra-Caballero replied to discuss the proposition with J. V. V. since they lived and worked together. The phone was then handed to J. V. V. and Guerra-Caballero stated in Spanish, "Gerardo, habla con ellos. Todo lo que ellos quierian. Preguntales que trabajo quieren, lo que sea uno esta dispuesto a todo. Dile que pueden trabajar conmigo, que cualquier chamba, lo que sea uno esta." Meaning, "Gerardo, talk to them. Everything they want. Ask them what job they want, whatever it is we're willing to do it all. Tell them they can work with me. That whatever job, whatever it is, one's there." The conversation ended shortly thereafter.

46. UC2 told J. V. V. that Guerra-Caballero aka "Blanco", had previously informed them that he had offered to do jobs on their behalf. J. V. V. inquired what the job entailed. UC2 then directed UC4 to explain to J. V. V. in Spanish details about the job. UC4 then began to converse with J. V. V. and explained that she had met a met a female at a bar during New Years Eve. The female later introduced UC2 and UC4 to her boyfriend, who is a supplier of methamphetamine. UC4 continued to explain that UC2 and UC4 arranged to purchase ten (10) pounds of methamphetamine for approximately $15,000. UC4 advised that while negotiating the upcoming narcotics transaction, UC2 and UC4 observed a truck with approximately 4-5 males, whom UC2 and UC4 believed were associated with the methamphetamine supplier. UC4 expressed safety concerns of potentially being robbed. J. V. V. agreed and stated, "yea of them switching it up on you." UC4 asked J. V. V. if they had experience conducting jobs where they served as a protection detail. J. V. V. replied, "si", meaning "yes" and said to call him if UC2 and UC4 needed "respaldo", meaning "backup." UC4 asked what type of backup would be provided. J. V. V. stated they would arrive in a separate vehicle and recommended for UC4 to dictate the meet location to the suppliers.

47. UC4 asked J. V. V. how many people he believed would be necessary for the protection detail. UC4 reiterated that UC2 and UC4 had observed approximately five (5) males the night of the negotiation. J. V. V. replied that he would provide two (2) vehicles as protection. UC4 proceeded to ask J. V. V. what him and his associates wanted to get paid. J. V. V. stated we would have to discuss payment with "Cuchillo" aka "Blanco" aka Guerra-Caballero. It should be

noted that "Cuchillo" is a Spanish term for "knife." UC2 and the CI requested J. V. V. to place a call to Guerra-Caballero to inquire about the protection detail payment. While J. V. V. retrieved his phone from his pocket, UC4 asked whether this was something J. V. V. and his associates were comfortable doing in which J. V. V. responded affirmatively. The CI additionally asked whether J. V. V. and his associates had conducted this type of job before in which J. V. V. replied, "Aca no, pero in Venezuela si." Meaning, "Not here, but in Venezuela yes." UC4 asked if J. V. V. was Venezuelan in which he responded affirmatively. J. V. V. proceeded to call Guerra-Caballero, placed it on speakerphone and handed the phone to the CI. It should be noted that during this call, UC4 heard an additional male voice the background. UC4 then suggested for J. V. V. to explain the job to Guerra-Caballero. J. V. V. asked Guerra-Caballero what they wanted in return and explained to Guerra-Caballero that the UCs were purchasing ten (10) pounds of methamphetamine and were looking for protection. Guerra-Caballero asked whether the UCs would be providing them with firearms in order to guard the UCs. UC4 replied "no" and asked if they had their own firearms. Guerra-Caballero stated they would provide as least "two small guns" and further asked how much the UCs would be paying them. The CI replied that the purpose of this call was to determine their price. Guerra-Caballero stated he believed approximately four (4) guards would be sufficient. J. V. V. then asked Guerra-Caballero how much he would charge in which Guerra-Caballero stated he was not sure and asked UC4 to make him an offer. UC4 asked Guerra-Caballero what type of protection he would be providing and if this was a job he was interested in doing. Guerra-Caballero replied. "yes yes yes of course of course. They know I'm serious with that, of course but I want to know how much you're offering, talk to me about "plata" [Spanish street slang for money] and I'll tell you yes, its fine." Per direction of UC2, UC4 asked Guerra-Caballero whether he was interested in money or a split of the proceeds (kilograms of methamphetamine). Guerra-Caballero replied he was interested in cash.

48. UC4 asked how many guards Guerra-Caballero would be bringing in which he replied four (4). UC4 then confirmed whether they would be bringing firearms in which both Guerra-Caballero and J. V. V. replied affirmatively. Specifically, Guerra-Caballero stated, "Si claro lo que usted quiera. Si hay que llevar porque (unintelligible) custodiar [Spanish slang for "guard or "watch over"] hay que llevar armas." Meaning, "Yes of course whatever you want. Yes, have to bring [firearms], have to guard, have to take firearms." UC4 asked, "that's how you do the job right?" Both J. V. V. and Guerra-Caballero replied, "yes." UC4 offered $1,000 per guard in which Guerra-Caballero replied, "yes yes yes perfect." Guerra-Caballero asked when this job would take place in which UC4 replied, sometime next week and advised that they would attempt to get the suppliers to the UC Location to conduct the transaction. UC4 asked Guerra-Caballero whether he would be back from Chicago. Guerra-Caballero replied he would be returning to Colorado the following day. The CI told Guerra-Caballero that the CI would be putting him (Guerra-Caballero) in contact with UC4 for further details. Guerra-Caballero replied, "Perfect give me the number. She can text or call me but tell her yes that we will do that job." Guerra-Caballero then told the CI that once Guerra-Caballero arrived to Colorado, Guerra-Caballero would get "squared away" and supply UC2 with "crystal." It should be noted that "crystal" is a street vernacular term commonly used to describe methamphetamine. The conversation then transitioned to firearms in which CI stated to Guerra-Caballero to put the CI in contact with Guerra-Caballero's firearms supplier in Chicago. The CI stated the CI had an interested customer in Chicago. Guerra-Caballero stated that they had offered him a firearm, but Guerra-Caballero stated it was too expensive and advised he was in Chicago looking for a firearms supplier. The

CI asked for the price of the firearm they offered Guerra-Caballero in Chicago in which Guerra-Caballero replied, "$1.800." The CI agreed the price was high.

49. While the CI was on the telephone with Guerra-Caballero, UC4 was engaged in a conversation with J. V. V. and inquired how long he had been in the U.S in which J. V. V. replied approximately one (1) year. UC4 explained she had recently heard about the Tren de Aragua organization (TdA) and inquired whether J. V. V. and Guerra-Caballero were affiliated. J. V. V. nodded his head affirmatively, pointed to the cellphone that was currently still on speakerphone and stated, "ellos si." Meaning, "they are." UC4 understood J. V. V. to mean that Guerra-Caballero and the other unidentified male in the background were TdA members. J. V. V. continued to state that Guerra-Caballero was affiliated with TdA. The CI asked whether J. V. V. was a member of TdA. J. V. V. replied that he was not a member, however, the unidentified male currently with Guerra-Caballero was a TdA member.

50. UC2 confirmed the details for the protection detail and then confirmed the price of $1,500 for the rifle. UC2 then obtained $1,500 of pre-recorded buy money/U.S. Currency for the undercover purchase of the rifle. UC2 counted out the money and handed it to J. V. V. in which J. V. V. then verified the amount. J. V. V. asked UC4 if the plan was to bring the suppliers to the undercover location for the methamphetamine purchase. After UC4 replied affirmatively, J. V. V. recommended for the UCs to set a different meet location with the suppliers prior to conducting the transaction at the UC Location to verify how many suppliers they would be dealing with and to conduct surveillance on the way to the UC Location.

51. The CI asked whether J. V. V. knew the female that Guerra-Caballero had previously brought to the undercover location. J. V. V. confirmed her name was "Alexandra." The CI stated that UC4 would be interested in meeting her to conduct future business. J. V. V. then left the UC Location in the previously identified vehicle.

52. UC2 purchased a firearm from J. V. V. , specifically, a Rock River Arms 7.62 mm rifle bearing serial number UT122056, and a magazine containing eight (8) rounds of ammunition (FIG. 12-13).



FIG. 12



FIG. 13

### *Undercover Purchase #6 – January 29, 2025*

53. Between January 24, 2025, and January 29, 2025, at the direction of Your Affiant, the CI continued to engage in recorded text messages and recorded phone calls with Guerra-Caballero regarding Guerra-Caballero, J. V. V., and their criminal associates assisting the UCs with protection during an undercover armed narcotics deal. Additionally, the UCs received the cell phone number for Guerra-Caballero and engaged in recorded calls and texts with Guerra-Caballero regarding Guerra-Caballero, J. V. V., and their criminal associates assisting the UCs with protection during an undercover armed narcotics deal.

54. On January 29, 2025, the UCs had multiple recorded conversations with Guerra-Caballero to continue discussions and planning for Guerra-Caballero, J. V. V., and their criminal associates to assist the UCs with armed protection during an undercover narcotics deal. Beginning from January 24, 2025, and continuing through the conclusion of the undercover narcotics deal, Guerra-Caballero and J. V. V. expressed willingness and excitement to assist the UCs with the armed protection detail for the narcotics deal.

55. On January 29, 2025, a male suspect (S1) wearing a brown hat, black short sleeve t-shirt and ripped blue jeans, initially arrived at the UC Location with another male suspect (S2), wearing a black hat, a black Nike hooded sweatshirt and green sweatpants, driving a silver car. Approximately 15 minutes later, an additional four (4) male suspects (S3) wearing light colored wind breaker jacket and white shorts, (S4) wearing a black hat, green long sleeve shirt, and brown pants, (S5) wearing a tan hat, a black long sleeve shirt, gray jeans and black shoes, and J. V. V. , wearing a blue hat, a black hooded sweatshirt and black pants (S6), arrived at the UC Location in two additional vehicles.

56. After the six (6) suspects had arrived at the UC Location, J. V. V.'s cell phone placed a video phone call to Guerra-Caballero. During the video phone call with Guerra-Caballero, the UCs, along with the 6 suspects, engaged in conversation regarding the armed protection detail that S1, S2, S3, S4, S5, and J. V. V. (S6), (the "Suspects"), had arrived at the UC Location to assist the UCs. During the video phone call with the Suspects, Guerra-Caballero wanted to ensure that all the Suspects had arrived at the UC Location. Guerra-Caballero had one of the Suspects turn the video phone call towards each individual Suspect to confirm they had safely arrived at the UC Location and confirmed that all the Suspects had brough firearms with them to appropriately conduct the armed protection for the UCs during the narcotics deal. Additionally, Guerra-Caballero wanted to confirm that the UCs and the Suspects were in agreement with each other regarding the Suspects protecting the UCs with firearms during the narcotics transaction. The UCs observed firearms and verified the Suspects were in fact armed with loaded firearms. All the Suspects were made aware and acknowledged that the Suspects were conducting armed protection for a ten (10) pound methamphetamine narcotics transaction. The UCs stated that each individual Suspect would be paid $1,000 for their participation and protection, and all Suspects (including Guerra-Caballero on the video phone call) acknowledged their participation and agreed with the payment for such. The UCs confirmed that all the Suspects (including Guerra-Caballero) acknowledged they each wanted to participate in the armed protection of the ten (10) pound methamphetamine narcotics transaction.

57. Once it was confirmed that all the Suspects wanted to participate, the UCs observed the Suspects beginning to load and chamber their firearms in preparation for the narcotics transaction to take

place. J. V. V. began to instruct the other Suspects to spread out during the narcotics transaction as a tactical way of protecting the UCs. The Suspects then discussed amongst themselves who would stand in certain spots inside the UC Location.

58. For the duration of the narcotics transaction, J. V. V. acted as the leader of the six (6) Suspects in order to control his criminal associates and ensure the narcotics transaction went smoothly. The UCs asked J. V. V. if he and the other Suspects were ready for the purported to be narcotics traffickers (two (2) additional ATF UCs), to bring the ten (10) pounds of methamphetamine to the UC Location.

59. From that point on, the ATF UCs conducted a pre-planned undercover ruse. During the ruse, the Suspects conducted an armed protection of a staged narcotics transaction. During the entire staged narcotics transaction, the Suspects were visibly armed, protecting the ATF UCs purporting to purchase the narcotics. Upon completion of the staged narcotics transaction, the UCs gave a pre-planned arrest signal, and an ATF arrest team took the six (6) armed suspects into custody.

60. After the six (6) Suspects were taken into custody, a Department of Homeland Security/Immigration Customs and Enforcement, Deportation Officer confirmed that all six (6) Suspects are unlawfully present in the United States and are citizens of the Country of Venezuela.

61. Subsequent to arrest of the Suspects, five (5) firearms were recovered from the Suspects persons, which are described as (FIG. 14):

- Taurus, G3C, 9mm caliber semi-automatic pistol, bearing serial number AEC155164
- Sig Sauer, P365, 9mm caliber semi-automatic pistol, bearing serial number 66B449089
- Smith & Wesson, model SD9VE, 9mm caliber semi-automatic pistol, bearing serial number HED7846
- Ruger, model Blackhawk, .357 magnum revolver, bearing serial number 34-06612
- Personally made firearm, 5.56 caliber AR style rifle



FIG. 14

62. Guerra-Caballero was taken into custody by law enforcement in Indiana.

## CONCLUSION

63. Based on the aforementioned information, Your Affiant submits that probable cause exists that on or about January 24, 2025, through January 29, 2025, in the State and District of Colorado, the defendant, Jose Manuel Guerra-Caballero, did conspire to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 846, and did aid and abet in the possession of a firearm in furtherance of that drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

64. As such, Your Affiant respectfully requests that the Court issue a criminal complaint and a corresponding arrest warrant for and against Jose Manuel Guerra-Caballero.

I, Joel N. Hegarty, Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, hereby depose and state that the above-mentioned information is true to the best of my information, knowledge and belief.

*/s/ Joel N. Hegarty*
Joel N. Hegarty
ATF Special Agent

**Affidavit reviewed and submitted by Garreth Winstead, Assistant United States Attorney.**

Sworn to and subscribed before me this  29th  day of January, 2025.

Timothy P. OHara
Digitally signed by Timothy P. OHara
Date: 2025.01.29 17:36:45 -07'00'

TIMOTHY P. O'HARA
United States Magistrate Judge
District of Colorado